UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CALVIN JOHNSON,

                                Petitioner,                  DECISION AND ORDER

-vs-

                                                            17-CV-6703 (CJS)

PAUL J. CHAPPIUS,

                                Respondent.
_____

      There is no dispute that on May 26, 2010, Petitioner Calvin Johnson shot and killed Ted Francis, Jr. during a melee on Henion Street in Rochester, New York. Despite Petitioner's claims that the shooting was justified, he was convicted after a jury trial in the New York State Supreme Court of murder in the second degree and three counts of criminal possession of a weapon. He was sentenced to twenty-five years to life in prison on the murder charge. The appellate division affirmed the conviction, but reduced Petitioner's sentence on the murder charge to fifteen years to life.

      Petitioner now applies to this Court for habeas relief pursuant to 28 U.S.C. § 2254, arguing that he was denied due process of law when the trial court refused to give the jury a "justification" instruction with respect to the intentional murder charge and one of the criminal possession of a weapon charges; that he was convicted on insufficient evidence; and that he received the ineffective assistance of counsel. For the reasons set forth below, Petitioner's application [ECF No. 1] is denied.

BACKGROUND

<u>Factual Background</u>

      The following is a summary of the relevant facts that a jury could have reasonably found from the evidence presented at trial.

      Ted Francis, Jr. – known more commonly by his nickname, Booka – spent the afternoon and early evening of May 26, 2010, at the public basketball court on Frost Avenue in the city of Rochester.

1

He was joined by his younger brother, Christopher, and several of his friends from the neighborhood. The group was not only playing basketball, but also socializing, drinking alcohol, and smoking marijuana. As the evening wore on, Booka became very drunk.

On that same day, Petitioner was hosting a barbeque at his mother's house a few blocks away on Henion Street to celebrate his girlfriend's birthday. For most of the late afternoon and evening, Petitioner was cooking and socializing with family and friends, and playing cards. At some point, he was joined by his younger brother, Clarence (nicknamed "Baby-C") and his cousin, Timothy Manley. After ten o'clock that evening, Baby-C and Manley, along with another cousin, Anthony Williams, borrowed a car from a family member so that Baby-C could drop Manley off at a friend's house on Woodbine Avenue, and go to the store. As the three pulled away, Baby-C was driving, Manley was in the passenger seat, and Williams was in the backseat.

The route Baby-C took to Woodbine Avenue required him to traverse Frost Avenue. Baby-C and Manley knew Booka and some of the individuals on Frost Avenue that evening, and had a history of problems with Booka. As Baby-C drove past the Frost Avenue basketball court, Manley yelled "da-da-doe" out the window at Booka and his group. Apparently, "da-da-doe" is slang for "murder," and at least two people began discharging firearms at Baby-C's car. Baby-C sped away, but not before the car was hit by gunfire twice on the driver's side. Consequently, Baby-C did not drop Manley off on Woodbine Avenue or stop at the store as originally planned, but instead proceeded directly back to his mother's house on Henion Street.

When Baby-C arrived at Henion Street, all occupants of the car were visibly shaken, and several attendees at the barbeque rushed over to survey the damage caused by the gunfire. Williams was in tears and upset with Baby-C and Manley, but he testified that Petitioner showed him a silver handgun and told him not to worry. Williams was not comforted, and walked across the street to sit behind a bush in a vacant lot, fearful that the shooters would follow them back to Henion Street.

2

Unbeknownst to Baby-C, Manley, or Williams, a second car on Frost Avenue had been hit by the gunfire: Booka's. When the shooting started, Booka had been walking to his car with his younger brother, and had pushed his brother to the ground to protect him. After the shooting stopped, Booka realized that his car had been hit and mistakenly believed that the bullets had been fired at him or his car by one of the occupants of Baby-C's car. Booka flew into a drunken rage, and got into a car to go in search of Baby-C.

Booka's search took him to the parking lot of a gas station on West Main Street, where he was captured on the station's video security system getting into a verbal and physical altercation with a young woman. The video shows Booka in cargo shorts and no shirt, and no discernible sign of being armed. After Booka's altercation with the young woman, he and his companions got into one of several cars that were in the gas station parking lot, and the caravan proceeded to Henion Street.

When the cars turned from West Main Street on to Henion Street, Booka spotted Baby-C and the other attendees at the barbeque, who had surrounded Baby-C's car and were inspecting the damage from the bullets. Booka hopped out of his car before it had rolled to a stop, and walked onto the sidewalk at the front of the house on Henion Street. Although witness accounts differed as to precisely what was said, Booka was loudly and aggressively demanding to know who had shot his car. As Booka was pursuing Baby-C and Manley, Baby-C's mother attempted to step between them and get Booka and his companions away from her property. A crowd of barbeque attendees had gathered behind Baby-C and his mother by this point, and a group of Booka's companions had gathered behind Booka. By all accounts there were more than twenty people gathered in front of the house. Booka pushed Baby-C's mother aside, and punches were thrown.

Petitioner was aware that his brother, Baby-C, had been driving a car that was hit by gunfire that evening, but he was in the process of cleaning up the side yard from the barbeque when Booka

approached the front of the house. Consequently, he was not among the groups that formed as Booka accosted Baby-C and Manley. However, Petitioner heard the disturbance, located a firearm, and began moving toward the front of the house as the confrontation intensified. As he neared the front of the house, Petitioner saw his mother and brother in close proximity to Booka, as well as a large group of strangers forming behind Booka. He stated that he believed at least one of the group members behind Booka had a gun at his hip. Although the exact sequence of events from that point is not entirely clear, it is not disputed that Petitioner moved closer to Booka and fired the handgun multiple times, hitting Booka twice in the chest and once in the back of the neck. Stippling found by the medical examiner on Booka's chest indicates that the shots were likely fired within two feet of Booka.

After Petitioner fired the shots, the crowd dispersed and the scene became even more chaotic. An unknown shooter fired additional shots, hitting one of Petitioner's cousins in the leg and damaging the siding of his mother's house. Petitioner's family scattered, seeking shelter in the house, the backyard, and on adjacent streets. After pausing momentarily in the backyard to satisfy himself as to the safety of his mother, Petitioner himself fled. Booka attempted to flee, but collapsed on the sidewalk, and had to be lifted into a car and rushed to a nearby medical center. From the medical center, Booka was transferred to Strong Memorial Hospital, where he ultimately died from the gunshot wounds.

After several months at large, Petitioner was apprehended in January 2011. He waived his Miranda rights and, in the course of a lengthy interview with police investigators, gave a statement[1] admitting that he shot Booka.

---

[1] A video of Petitioner's statement was introduced into evidence at trial as People's Exhibit No. 91.

Procedural History

Petitioner was indicted by the grand jury on five counts: murder in the second degree in violation of N.Y.P.L. § 125.25(1) (intent to cause the death of another), murder in the second degree in violation of N.Y.P.L. § 125.25(2) (depraved indifference to human life), criminal possession of a weapon in the second degree in violation of N.Y.P.L. § 265.03(1)(b) (intent to use unlawfully against another), criminal possession of a weapon in the second degree in violation of N.Y.P.L. § 265.03(3) (possession not in home or place of business), and criminal possession of a weapon in the third degree in violation of N.Y.P.L. § 265.02(1).

In his opening statement at trial, defense counsel explained to the jury Petitioner's position on the charges:

Calvin Johnson is not guilty of the murder of [Booka].

* * *

. . . [I]t's going to be important to look at the big picture and to look at what Calvin Johnson was going through at the time that this happened. I think you're going to find that much of this case, the facts, you're going to find a lot of agreement . . . . Yes, it was a family barbeque. Yes, cooking ribs in the back. Calvin was doing the cooking. Yeah, the brother went out in a car. Calvin doesn't know as he sits there anything about what prompts the shooting but he does know that somebody comes back home, his brother comes back home; his brother, his cousin, another individual and they've been shot at by some guys on Frost Street. At this family barbeque, girlfriend's birthday party, ribs and a card game has all of a sudden taken a turn for the worse because somebody out there obviously wants some loved one of Calvin's dead. Somebody is firing shots. That's what Calvin knows.

And some time later, you'll hear the testimony, that Booka comes over to this house, Calvin's mother's house, where the family barbeque is taking place. [The prosecution] suggested that the evidence is going to show that he was just looking for a fight. I think the evidence will show that he didn't come alone. He brought lots of people. Lots of people. And I submit to you that the evidence is going to show that these people didn't come with just their bare hands. They had guns. And I'm going to submit to you that the evidence is going to show that they had the same guns that had already been firing at the family members of Calvin Johnson. * * *

I submit to you, and I submit the evidence will show, that Calvin Johnson walked out on to his mother's yard and saw a situation with two groups of people, people that he loved and people who he didn't know but who had just shot at family members. And I

>submit that under those circumstances, as you hear the law, a shooting is not necessarily an intentional or unjustified murder as the prosecution is trying to prove, that a shooting is not necessarily a murder . . . . But you're going to have to focus on the law and what the legal definitions are when the judge reads them to you as to whether or not what the People intend to prove, this was an intentional and unjustified killing. And I submit to you that the evidence is going to show that it wasn't.

Trial Tr. at 422:9–427:17.

At the close of evidence, the trial court denied defense counsel's motion to dismiss all counts of the indictment. In addition, the trial court denied defense counsel's request for a jury instruction on a justification defense. Trial Tr. Vol (II), 1089:14–15. After a day of deliberation, the jury convicted Petitioner on the intentional murder count, and all three of the criminal possession of a weapon charges. Petitioner was sentenced to twenty-five years to life imprisonment for intentional murder, and was given concurrent sentences for the criminal possession of a weapon convictions.

Petitioner appealed, arguing that the trial court's failure to give a jury instruction recognizing Petitioner's potential defense of justification on the intentional murder and criminal possession of a weapon with intent to use unlawfully charges resulted in the denial of due process under the 14th Amendment, and that the twenty-five years to life sentence was unduly harsh or severe. In a supplemental brief filed *pro se*, Petitioner also argued that he was convicted on insufficient evidence, that he received the ineffective assistance of trial counsel, and that the cumulative errors at trial violated his due process rights.

Viewing the evidence in the light most favorable to Petitioner, the appellate court concluded "that there is no reasonable view of the evidence from which the factfinder could have found that [Petitioner]'s actions were justified," and therefore that Petitioner was not entitled to the jury instruction for justification on the murder charge. *People v. Johnson*, 136 A.D.3d 1417, 1417–18 (N.Y. App. Div. 2016). With respect to the justification instruction on the criminal possession of a weapon charge, the appellate court noted that "[i]t is well settled that the defense of justification does not apply to that crime." *Johnson*, 136 A.D.3d at 1418 (citing *People v. Pons*, 501 N.E.2d 11 (N.Y.

6

1986)). Further, although the appellate court did not find merit in any of Petitioner's *pro se* ineffective assistance of counsel claims, it did agree that under the circumstances of the case, Petitioner's sentence was unduly harsh, and reduced the sentence imposed on the murder charge to an indeterminate term of incarceration of 15 years to life. *Johnson*, 136 A.D.3d at 1418. Petitioner's application for leave to appeal to the New York Court of Appeals was denied. *People v. Johnson*, 61 N.E.3d 515 (N.Y. 2016).

On October 10, 2017, Petitioner filed *pro se* the instant habeas application, maintaining that he was denied his constitutional rights to due process when the trial court failed to give the requested justification jury instruction for the murder and criminal possession of a weapon in the second degree charges, and that he was convicted upon insufficient evidence. Further, Petitioner maintains that he received the ineffective assistance of trial counsel. Respondent opposes the petition. Resp. Mem. in Opp., Apr. 23, 2018, ECF No. 8.

## LEGAL STANDARD

Petitioner makes his habeas corpus application pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well-settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). "Should the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). For claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in

a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Chrysler*, 806 F.3d at 117 (quoting 28 U.S.C. § 2254(d)(1)).

A principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)). A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (citation omitted).

## DISCUSSION

Because Petitioner is proceeding on this petition *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nevertheless, after a review of the papers in this case and the transcripts and records of the state court proceedings, in accordance with Rule 8 of the Rules Governing Section 2254 Cases, the Court finds that an evidentiary hearing is not necessary to address Petitioner's arguments. *See also* 28 U.S.C. § 2254(e)(2).

<u>Petitioner's due process claims are without merit because Petitioner has failed to demonstrate that he was entitled to the justification instruction on either the intentional murder, or the criminal possession of a weapon with intent to use unlawfully charges</u>.

Petitioner maintains that the trial court erred by failing to give the requested justification instruction with respect to the intentional murder charge "when there was proof submitted to the jury, that [Petitioner] was acting [o]n behalf of his mother's home when a group of people approached the home in a violent man[ner]." Pet. at 5. He also argues that the trial court erred by failing to give the requested justification with respect to the criminal possession of a weapon with intent to use unlawfully charge because the weapon "was given to him minutes before the incident just to protect his family and [their] home f[rom] the group of violent people that approached the home . . . ." Pet. at 7.

Respondent identifies four reasons that he believes Petitioner's claim regarding the murder count has no merit: (1) because no reasonable view of the evidence supported a finding that Petitioner reasonably believed that Booka was threatening the imminent use of deadly physical force, (2) because the use of deadly force was excessive under the circumstances, (3) because Petitioner was the initial aggressor, and (4) because Petitioner failed to retreat despite the opportunity to do so safely. Mem. in Opp. 20–24. Moreover, Respondent argues even if the trial court did err, Plaintiff has failed to show that the error affected the verdict. Mem. in Opp. 25–29. With respect to the criminal possession of a weapon charge, Respondent states that a justification charge was not warranted where the associated murder charge was not justified. Mem. in Opp. at 30.

*Legal Principles*

To obtain habeas relief on this issue, Petitioner must demonstrate that: (1) New York law required the trial court to give the justification instruction; (2) the absence of the instruction by itself so infected the entire trial that the resulting conviction violated due process; and, (3) the trial court's

9

contrary finding on steps 1 and 2 does not survive scrutiny under the deferential standard articulated in § 2254(d). *Taylor v. Capra*, 412 F. Supp.3d 126, 133 (E.D.N.Y. 2019).

With respect to the first inquiry,[2] whether New York law required the trial court to give the justification instruction, the district court's role "is not to interpret New York's law of justification, but to determine whether the evidence [presented at trial] was sufficient to warrant a justification charge under that law." *Jackson v. Edwards*, 404 F.3d 612, 621–22 (2d Cir. 2005) (quoting *Davis*, 270 F.3d at 123–24 n. 4.). As the Second Circuit has explained:

> Under New York Penal Law § 35.15, a justification charge is warranted if "any reasonable view of the evidence," *People v. McManus*, 496 N.E.2d 202 (N.Y. 1986), would permit the jury to find that (1) defendant believed deadly physical force was necessary to defend against the imminent use of deadly physical force, and (2) a reasonable person would have believed the use of deadly physical force was necessary in those circumstances, *see Matter of Y.K.*, 663 N.E.2d 313 (N.Y. 1996). A defendant is not entitled to a justification charge if, despite such subjective and objective belief, defendant failed to retreat when he knew he could do so safely, or was the initial aggressor. *See* N.Y. Penal Law § 35.15(1)(b), (2)(a).

*Rodriguez v. Heath*, 648 F. App'x 136, 138 (2d Cir. 2016).

"In determining whether the evidence warrants a justification charge, the reviewing court must view the record in the light most favorable to the defendant . . . . [but] the court is not required to adopt an artificial or irrational view of the evidence . . . ." *Hubrecht v. Artus*, 457 F. App'x 29, 31 (2d Cir. 2012) (internal quotation marks and citations omitted).

### Intentional Murder

In asking the trial court to give a justification instruction on the intentional murder charge, defense counsel acknowledged that Booka was unarmed, but pointed out that Booka "did show up

---

[2] Because the justification instruction in the present case was essential to Petitioner's defense, Second Circuit precedent establishes that if the instruction was improperly withheld, such a withholding constituted a denial of due process. *See, e.g., Davis v. Strack*, 270 F.3d 111, 131 (2d Cir. 2001) (finding a denial of due process where the defendant had confessed to intentionally shooting the victim and denial of an instruction on justification rendered the case against him "open and shut"); *Rodriguez v. Heath*, 648 F. App'x 136, 140 (2d Cir. 2016) (finding denial of due process where the trial court gave the justification charge for defendant's second-degree murder and first-degree manslaughter counts, but no his second-degree manslaughter counts). Therefore, the Court will focus on the question of whether New York law required the trial court to give the justification instruction.

10

with twenty other individuals and it's defense against the mob . . . as much as against . . . any weapon" that entitled Petitioner to the instruction. Trial Tr. at 1076:4–12. Further, with respect to whether Petitioner was the initial aggressor, defense counsel pointed out that someone in the Frost Avenue group had used deadly force against Baby-C forty-five minutes prior to Booka's shooting, and that the same group had appeared at Petitioner's home and confronted Baby-C and others in Petitioner's family. Trial Tr. at 1076:13–22. Finally, defense counsel maintained that it would have been impossible for Petitioner to retreat safely in the face of the mob that accompanied Booka, and also indicated that Petitioner was not simply defending himself, but also all friends and loved ones at the barbeque. Trial Tr. at 1077:4–16, 1087:16–19.

Although the trial court did not elaborate on the record as to its reasoning for denying defense counsel's request for the justification instruction (Trial Tr. at 1089:14–17), the appellate court reviewed the decision and concluded that "that there is no reasonable view of the evidence from which the factfinder could have found that defendant's actions were justified." *Johnson*, 136 A.D.3d at 1417–18. Specifically, the appellate court noted that it is undisputed that the victim was shirtless and unarmed, and that Petitioner admitted to law enforcement in the video-taped interview admitted into evidence, that "he never observed anyone in the victim's group using or about to use deadly physical force." *Id*.

After a thorough review of the record from the trial court, including the full transcript and the video entered into evidence of Petitioner's interview with law enforcement (People's Exhibit No. 91), the Court agrees with the conclusions of the state trial court and appellate court. Even viewing the evidence in the light most favorable to Petitioner, a justification instruction was not warranted.

Most significantly, Petitioner admitted that he did not see Booka with a weapon or making a movement toward a weapon. Rather, Petitioner stated that he saw and heard Booka yelling at Baby-C, trying to throw punches, and making hand gestures that Petitioner interpreted as a sign for others

11

in Booka's group to approach. No other witnesses at trial believed Booka to have a weapon, there is no evidence that Booka made any express threats of deadly force or that he was calling for anyone else to use deadly force, and there is no indication that he made movements which could have been interpreted as an attempt to retrieve a weapon that may have been concealed on his person. Instead, it is undisputed that Booka was shirtless and in cargo shorts, and that his hands were engaged above his waist in the beginnings of a physical altercation with either Baby-C, Manley, or another friend of Petitioner's. In short, no reasonable view of the evidence would have led a reasonable person to believe that Booka was about to use deadly physical force, or that the use of deadly physical force was otherwise necessary against Booka in those circumstances. *See, e.g., People v. Vecchio*, 240 A.D.2d 854, 855 (N.Y. 1997) (finding that the trial court did not err in refusing defendant's request for a justification instruction because his "use of a dangerous instrument against an unarmed individual cannot be viewed as anything other than an excessive use of force, thereby precluding the defense of justification.").

Additionally, with respect to defense counsel's argument before the trial court invoking the fact that Baby-C's car had been shot earlier in the evening, and that Petitioner's action was a "defense against the mob rather than against any particular weapon," Petitioner admitted to law enforcement that he did not actually see a gun that evening, and he did not see anyone in Booka's group about to use deadly physical force with a firearm or otherwise. It is not disputed that a mere forty-five minutes before Booka's shooting, Baby-C's car had been shot at by unknown individuals in a group that Booka was known to be associated with. But to charge the jury with a justification instruction based on such vague circumstances "would have required the jury to speculate as to a sequence of events unsupported by any direct evidence, to disregard materially undisputed evidence, and to draw tenuous inferences." *Robinson v. Greene*, 507 F. Supp.2d 279, 293 (W.D.N.Y. 2007). As indicated above, the court is not required to adopt an artificial – or wholly speculative –

view of the evidence. *Hubrecht*, 457 F. App'x at 31. *See also Deleon v. Lempke,* No. 09 CIV. 2310 (BMC), 2009 WL 4498006, at *3 (E.D.N.Y. Dec. 2, 2009), *aff'd*, 401 F. App'x 610 (2d Cir. 2010) ("the mere fact that someone fired a shot or two before petitioner did . . . could not support a jury's finding that petitioner reasonably believed that deadly force was necessary or that a reasonable person would have so believed").

*Criminal Possession of a Weapon with Intent to Use Unlawfully*

Petitioner also maintains that he was denied the due process of law when the trial court refused to give the justification instruction regarding the criminal possession of a weapon with intent to use unlawfully charge. However, "[u]nder New York law, justification under Section 35.15 is not a defense to second degree criminal possession of a weapon." *Jackson v. Edwards*, 404 F.3d 612, 626 (2d Cir. 2005) (citing *People v. Pons*, 501 N.E.2d 11 (N.Y. 1986)). Although the Second Circuit has recognized circumstances under which a failure to give a justification instruction on a homicide charge may nevertheless "fatally taint" a weapons possession conviction, those circumstances are not present here. *See, e.g., Jackson*, 404 F.3d at 626–27 (finding a "fatally tainted" weapons possession conviction where the trial court improperly withheld a justification instruction on a manslaughter charge); *Davis*, 270 F.3d at 134 (stating that "[i]f the jury found that [defendant] had intended to use the gun only in circumstances falling within the protection of the justification statute . . . then the jury might have determined that the [prosecution] had failed to prove the essential element of intent to use the gun unlawfully."). As indicated above, the trial court did not err when it refused to give the justification instruction on the murder charges in Petitioner's case. It would defy logic to require the trial court provide a justification instruction regarding Petitioner's possession of a weapon with an *intent* to use it in circumstances under which Petitioner's *actual* use of the weapon is not justified under New York law.

13

Accordingly, the Court finds Petitioner's argument that he was denied the due process of law when the trial court refused to charge the jury with a justification instruction on the intentional murder charge and the criminal possession of a weapon with intent to use unlawfully charges to be without merit.

<u>Petitioner's insufficiency of the evidence claim is without merit because he has failed to rebut the presumption that the trier of fact properly resolved conflicting inferences from the evidence</u>.

Second, Petitioner maintains that the guilty verdict was based on insufficient evidence because the prosecution failed to prove beyond a reasonable doubt that Petitioner's use of deadly physical force against Booka was not justified. Pet. at 10. Petitioner states that "[h]e had every right to protect his family and home," and therefore that "[w]ithout the instruction of justification, the verdict in this case [could] not have been proven beyond doubt, when there was direct testimony by the defendant that he feared that his family was in danger, when the group of people approached his family home, with violent intentions, [and] the same group of people had just shot his cousin['s] car up with guns . . . ." *Id.*

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime." *Massey v. New York*, No. 10-CV-0857 MAT, 2011 WL 6180452, at *3 (W.D.N.Y. Dec. 13, 2011) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). Nevertheless, "a petitioner bears a very heavy burden in convincing a federal habeas court to grant a petition on the grounds of insufficiency of the evidence." *Policano v. Herbert*, 507 F.3d 111, 116 (2d Cir. 2007) (*Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000)). A "state criminal conviction will be upheld if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Thus, even when "faced with a record of historical facts that supports conflicting inferences, [this Court] must presume . . . that the trier of fact resolved any such conflicts

14

in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994).

In the present case, Petitioner does not dispute that he possessed a weapon during the period in question, and fired the shots that killed Booka. Petitioner also does not dispute that Booka had no shirt on, and was wearing only cargo shorts. In fact, none of the witnesses who testified at trial saw Booka with a gun, or indicated that his use of deadly force was imminent.[3] Instead, witnesses testified variously that he was throwing punches at Baby-C, going after Manley, or fighting off an attack from Petitioner's friend, Bones. Moreover, despite Petitioner's claim in his taped statement to law enforcement that he only started shooting after he heard what he believed to be gunfire, testimony analyzing the "shot-spotter" recording of Booka's shooting suggests that Petitioner fired first.

Based on this evidence, a rational trier of fact could have found all the essential elements of second-degree murder and criminal possession of a weapon beyond a reasonable doubt. *Herrera v. Collins*, 506 U.S. 390, 402 (1993) (for the purposes of a habeas application, the sufficiency-of-evidence "inquiry does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit."). The Court therefore finds that Petitioner's legal sufficiency argument is without merit.

<u>Petitioner's ineffective assistance claims are without merit because he failed to show that counsel's performance was constitutionally deficient</u>.

Finally, Petitioner maintains that his trial counsel's performance was constitutionally deficient in multiple respects. Pet. at 8; State Court Record ("SR"), 5–61, Apr. 23, 2018.  Specifically, in his habeas application, Petitioner argues that trial counsel failed to develop a sufficient appellate record by failing to seek dismissal of the intentional murder. Pet. at 8. Petitioner also incorporates by

---

[3] According to the *Dictionary of Modern Legal Usage*, "*Imminent* means "certain and very near, impending" . . . . *Imminent* does not mean merely "probable" . . . . Garner, Brian, *A Dictionary of Modern Legal Usage*, 277 (1987). *See also Nicholson v. Scoppetta*, 820 N.E.2d 840, 845 (N.Y. 2004) (stating in a different legal context that "Imminent danger . . . must be near or impending, not merely possible.").

15

reference the ineffective assistance issues that he raised on direct appeal to the state appellate court, including failure to move for dismissal of the first count of the indictment (intentional murder) on the basis of defectiveness, failure to object to the defective jury charge regarding intentional murder, and failure to adequately preserve the legal question concerning justification.

*Legal Principles*

The Sixth Amendment guarantees a criminal defendant the right to "reasonably effective assistance" of counsel. To establish ineffective assistance of counsel, a defendant must satisfy the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" under the "prevailing professional norms." *Vadas v. U.S.*, 527 F.3d 16, 20 (2d Cir. 2007) (citing *Strickland*, 466 U.S. at 688). Second, the defendant must demonstrate he was prejudiced by the ineffective conduct. *Strickland* at 687–88. A defendant's failure to satisfy one prong of this two-pronged test relieves the court of any requirement to consider the other prong. *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991).

*Application*

At the outset, the Court finds that the ineffective assistance claim that Petitioner raises in his habeas application is without merit. Petitioner states that defense counsel failed to develop a sufficient appellate record by failing to request that the intentional murder charge from the indictment be dismissed. However, in his trial order of dismissal, defense counsel did request dismissal of the intentional murder count, and stated his reasons. Defense counsel stated:

> At this point, I would make a motion for a trial order of dismissal. In general, my motion is on each and every count the People have failed to make a prima facie case. I understand the Court's standard is viewing this evidence in the light most favorable to the prosecution.
>
> With respect to the Murder Second, the first count, the intentional murder count, I would submit that the People have failed in that they have not shown an intent to kill. Further, they have not shown that the act was unjustified. And for those two reasons,

> I submit that with respect to the Murder Second in the first count should be either dismissed or reduced.

Trial Tr. at 980:18–25. Later in the proceedings, prior to the trial court's instructions to the jury, defense counsel sought to ensure the record was adequate. He renewed his motion to dismiss all counts in the indictment, especially the murder counts, and the trial court responded, "[f]or the record, you have renewed your request for a trial order of dismissal." Trial Tr. at 1068:5–23.

Turning to the ineffective assistance claims that Petitioner first raised in his direct appeal, the Court notes that:

> [W]hen a claim "was adjudicated on the merits in State court proceedings," a federal court may not issue a writ of habeas corpus unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2). Findings of fact by the state court are presumed correct, and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." Id. § 2254(e)(1). To find that a state court has unreasonably applied clearly established federal law, "we must be able to adequately identify why [we] found the [state-court] decision ... to be objectively unreasonable." [Jimenez v. Walker, 458 F.3d 130, 147 (2d Cir. 2006)] (citation omitted).

Murden v. Artuz, 497 F.3d 178, 197 (2d Cir. 2007).

Here, Petitioner merely refers to the arguments that he made in the supplemental brief he submitted *pro se* on his direct appeal. He does not offer any argument demonstrating that the state appellate court's conclusion that none of the arguments in Petitioner's *pro se* brief "requires reversal or further modification of the judgment" is either contrary to or an unreasonable application of clearly established federal law. Johnson, 136 A.D.3d at 1418. Moreover, the Court has conducted an independent review of Petitioner's *pro se* brief, and finds that the issues that Petitioner maintains trial counsel ought to have raised with respect to the deficiencies of the indictment, the trial court's jury instructions, and the verdict sheet are either entirely without merit or matters of trial strategy. See, e.g., Parker v. Graham, 517 F. Supp.3d 138, 151 (W.D.N.Y. 2021) ("Trial counsel should be

17

afforded wide leeway in determining how to challenge a case with strong direct and circumstantial evidence."). Lastly, defense counsel ably and vigorously represented Petitioner in pretrial motions (Huntley and Wade hearings), jury selection, cross-examination of the prosecution's witnesses, direct examination of defense witnesses, the charging conference, and summation. *See, e.g., Trippe v. Calavito*, 524 F. Supp. 829, 834 (S.D.N.Y. 1981) (quoting *United States v. Yanishefsky*, 500 F.2d 1327 (2d Cir. 1974) (declining to find that "a vigorous defense" which "adequately presented petitioners' claims to the state courts" was "so woefully inadequate as to shock the conscience of the court, and made the proceedings a farce and mockery of justice.").

Accordingly, Petitioner's claims of ineffective assistance of counsel must be dismissed.

CONCLUSION

Based on the foregoing, it is hereby ORDERED that Petitioner's application for habeas relief [ECF No. 1] is denied. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Petitioner has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

Dated:   May 6, 2022
         Rochester, New York

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge